**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LORETTA SANDONE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY | : | NO. 04-5760 |

**MEMORANDUM AND ORDER**

Norma L. Shapiro, S.J.                                        April 20, 2006

Loretta Sandone ("Sandone") seeks judicial review, under 42 U.S.C. §§ 405(g) and

1383(c)(3), of the final decision by the Social Security Commissioner  ("SSC") to deny

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties

filed cross motions for summary judgment. Magistrate Judge Arnold C. Rapoport ("Judge

Rapoport" or "the Magistrate Judge") issued a Report and Recommendation ("R & R") to grant

the SSC's motion for summary judgment and uphold the denial of benefits.  Sandone objects

that: (1) the Magistrate Judge erred in finding that the denial of benefits was supported by

substantial evidence; (2) the Medical Examiner who testified at Sandone's hearing before the

Administrative Law Judge ("ALJ") was employed by the Social Security Administration and not

impartial; (3) the Magistrate Judge erred in upholding the ALJ's finding that certain of Sandone's

impairments were not severe; (4) the Magistrate Judge erred in finding that Sandone failed to

1

"demonstrate a disorder that caused more than a minimal limitation of ability to do basic work activities."  After *de novo* review of Judge Rapoport's R&R, the SSC's motion is granted, Sandone's motion is denied, and the decision of the SSC is affirmed.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

*A. Procedural History*

Sandone applied for SSI on April 18, 2002.  She alleged that she had been disabled since December 23, 2001, because of bipolar and post-traumatic stress disorders.  The state agency responsible for disability determinations denied Sandone's claim for benefits; Sandone then filed a timely request for hearing before an ALJ.  At the hearing, Sandone, represented by counsel, testified, as did a medical examiner ("ME") and a vocational expert ("VE").  Sandone also requested reopening of a prior denial of SSI; the alleged onset date was amended to May 19, 2000.

The ALJ found: Sandone's bipolar disorder was a "severe impairment" but did not meet or medically equal one of the enumerated impairments; Sandone's borderline personality disorder was not severe; Sandone's polysubstance abuse disorder was in remission, with no evidence of abuse in the relevant period; and Sandone's physical impairments were not severe. The alleged post-traumatic stress disorder was not discussed.  R. 17-18, 26.  The ALJ also found Sandone had "no exertional limitations and . . . retain[ed] the residual functional capacity to perform the exertional demands of all levels of work"; Sandone could "follow simple instructions, with one or two step demonstrations, and she should not be in a job which requires

---

[1] Adopted in part from the comprehensive statement of  facts in Judge Rapoport's R & R.

close 'constant' supervision or directives," R. 25; Sandone could perform the type of unskilled

work she had performed in the past (e.g., inventory clerk). Additionally, as a younger person

with limited education, she would not encounter difficulties transferring her skills and could

"make a vocational adjustment to work that exists in significant numbers in the national

economy," so Sandone was not eligible for SSI benefits. *Id.*

The Appeals Council denied Sandone's request for review; the ALJ's decision became

the final decision of the Commissioner. Sandone then filed this action to seek judicial review of

the Commissioner's decision.

## B. Factual Background and Medical History

Sandone, born on March 31, 1966, completed the eighth grade and obtained certifications

as a medical assistant and a nurse's aide. In the past she was employed as an inventory clerk, a

cashier, a nurse's aide and a phlebotomist; she also worked in fast food service. R. 128. Her last

job, held between June and December 2001, was as an inventory clerk at Wal-Mart. *Id.* At the

time of the administrative hearing, she lived with her mother, her handicapped teenage son, and

her infant daughter. R. 39.

Sandone has a history of mental health issues going back to her early childhood. She has

reported seeing a mental health professional for the first time at the age of three or five. R. 52,

133. The earliest documented sign of mental health issues in the record was in 1994, when she

reported to a physician that she was taking Zoloft for "psychiatric episodes." She also reported

heavy drinking. The record contains limited psychiatric and other data for the few years

immediately prior to the alleged onset of disability. In 1996, Sandone fell on the ice; her

3

fractured right ankle required surgery.  R. 214-43, 268-69.  During the same year, the laceration

of her biceps required surgery.  R. 255-63.   In 1997, x-rays showed her right ankle had not yet

completely healed.  R. 195-208.

   In April, 2000, police brought her to a psychiatric facility because she had been

screaming for several hours.  R. 278-81.  Records from the facility show that she reported having

broken up with her boyfriend several days earlier, taking illegal drugs and having sex with four

men in 24 hours to punish her boyfriend.  She told doctors she was taking the drugs Depakote

(used to control manic episodes in bipolar patients) and Prozac (an antidepressant).  She also

reported chronic pain from past arm and leg surgery.  She was diagnosed with bipolar disorder,

polysubstance abuse, and borderline personality disorder.  She was released three days later.

   Sandone claims a disability onset period of May 19, 2000.[2]   Sandone said she stopped

drinking in April, 2001.  R.133.  In January, 2002, Sandone reported being in a car accident; the

doctor noted pressured speech.  *Id.*  Also in January, her Depakote prescription was renewed.   In

February, she received a psychiatric check-up.  R. 133-135.  Sandone reported difficulties

sleeping, mood swings, short temper, and feeling hyper and sensitive; she had felt this way most

of her life.  She was diagnosed, again, with bipolar disorder and in the manic stage of the illness.

The examination notes state she had taken a number of different drugs for her condition but since

May, 2001, had been taking only Depakote.  They also state that Sandone's condition had been

exacerbated by alcohol and drug abuse, but she reported having been "clean" for nine months.

Sandone was "pleasant, calm and cooperative" during the examination, although her "speech was

---

[2] Sandone initially applied for SSI benefits claiming disability starting December 23, 2001 (the last day she held a job).  At the hearing she requested the ALJ to reopen a prior protective application filed in May, 2000.

somewhat over-productive and euphoric." She was prescribed Depakote and Seroquel (a drug used in the management of bipolar disorder). Her medication was adjusted twice during the next month; Buspar (an anti-anxiety drug) and Paxil (an anti-depressant) were prescribed.

At the same time, Sandone had difficulties in her group therapy sessions. On March 13, she became aggressive with a group member; the next day she apologized but later had a confrontation with another member, and was transferred to a different group. R. 302, 304. She asked to be allowed to stay in her original group and work things out, but she was not permitted to and became angry at the therapist. R. 298-301. In the same period, Sandone continued to complain of aftereffects from the car accident, primarily neck pain and headaches. In late March, she reported falling down the stairs and hurting her knees; a contusion of the left knee was diagnosed. Sandone refused imaging of her right shoulder. On April 9, Sonata (a sleep medicine) was added to Sandone's prescriptions. R. 149. Sandone continued to complain of headaches through late April and was prescribed anti-allergy medications and muscle relaxants.

On April 18, 2002, Sandone met with a Social Security Administration interviewer. R. 111-112. She became "very boisterous and loud" during the interview when she learned she could not have life insurance over a certain amount for burial purposes. She told the interviewer she had been clean of drugs for one year and "went on a bit, but it was like she was doing so to stay sane." In May, her prescriptions were changed to Klonopin (an anticonvulsant drug sometimes prescribed to bipolar patients), Wellbutrin (an antidepressant) and Sonata.

A week later, Sandone was hospitalized and voluntarily committed to a crisis center. R. 143. A "Comprehensive Assessment" completed on May 22 recorded that Sandone was attending Narcotics Anonymous and Alcoholics Anonymous meetings and had "a lot of

girlfriends in recovery."  It also: identified a "toxic relationship" (apparently with her

handicapped teen-age son); described Sandone as "loud and aggressive"; and noted "no

psychotropic medication" had "stabilized" Sandone.   On May 28, 2002 Sandone discovered she

was pregnant.  In July, she was taken off all medications except a low dosage of Paxil (an

antidepressant).  R. 186.

      On July 25, 2002, Sandone completed a questionnaire for the State Agency.  R. 121-25.

She reported sleeping a lot, but being able to cook and clean.  She wrote her mother had to

handle her bills; criticism made her very angry; and authority figures brought out "rage."  She

reported she was still attending NA and AA meetings, but was not taking medications because

pregnant; as to her work history, she had had problems retaining work in the past because of

absences and problems with supervisors.   In August, Sandone's treatment was re-evaluated.  R.

129.  The evaluation form records 20% progress since the start of treatment and identifies mood

swings, racing thoughts, temper control, and "polysubstance abuse history" as problems.  R. 151-

67.  On August 1, her progress record noted she was "stable without medicine."  R. 131.  On

August 11, the specialist completing a new mental health treatment plan again noted a diagnosis

of bipolar disorder and for the first time also a personality disorder.  R. 284.  Sandone's GAF was

measured as 55 (moderate impairment in social and occupational functioning).  *Id.*  On August

14, Sandone's counseling was terminated because she left an angry note under the therapist's

door.

      In September, 2002, Dr. Gavazzi, the State Agency psychologist, reviewed Sandone's

record.  R. 151-67.  He diagnosed an affective disorder but not the degree of limitation Sandone

suffered in the different categories relevant to the Listings.  He noted "bipolar, polysubstance

abuse," "improved with Depakote"; as to Sandone's ability to perform daily living tasks, he wrote Sandone "can groom, maintain hygiene, drive a car, manage finances, clean, and prepare simple meals."  Dr. Gavazzi recorded that Sandone had not been hospitalized in the current year. He found moderate limitations in the ability to understand, remember, and carry out detailed instructions; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers.  He also found Sandone not wholly credible when she reported she was short-tempered and unable to relate to others; he wrote Sandone could  "communicate clearly, relate to familiar others, ask simple questions, request assistance, and respond to direction from authority."

In October, 2002, still only on Paxil, Sandone was tested by the Center for Alternative Learning at the request of the Department of Welfare.  R. 276-77.  The Learning Specialist recorded good vocabulary and writing, but poor math skills.  He found significant attention problems and moderate learning problems.  Sandone's attention difficulties resulted in her missing details and doing things too quickly.  She had significantly below-average organizational skills.  She was found "functionally disabled."

In November, 2002, now five months pregnant, Sandone met with a new psychiatrist. The psychiatrist appears not to have made a diagnosis himself, but rather to have referred Sandone out to a psychologist for counseling.  R. 273-75.

In January, 2003, at the time of the administrative hearing before the ALJ, Sandone was living with her mother, her handicapped nineteen-year-old son, and her infant daughter.  Her son attended high school.  R. 40.  Her mother worked during the day at a nursing home as a dietary aide.  *Id.*  Sandone testified that she provided all the care for her eleven day old baby during the

7

day.  R. 40-41, 57.  Her teenage son got himself off to school.  R. 55.  She reported that the baby slept a lot during the day, and that her mother was home by 3:00 p.m. to assist her in caring for the baby.  R. 57.

Sandone testified that she had lived with her mother most of her life except from 1997 to 2000 when she lived in Delaware with a man and later by herself.  R. 53.  When asked about friends, she stated that she had "a really wonderful support system . . . an army of women in and out of the [AA] program who support me."  R. 53.  She stated that she got together with these women outside of meetings.  R. 53-54.  She also had a good relationship with her mother, who was "her best friend."  R. 52.

She testified that she had taken Depakote and Sonata prior to her pregnancy.  R. 42. The Depakote and Sonata worked okay but did not always control her symptoms.  R. 42.  Prior to her pregnancy, she had been in intensive out-patient treatment and was very actively involved in AA, which gave her an outlet.  R. 42.  She reported that during her pregnancy she had been testy most of the time because she was not on the correct medications and could only take Paxil.  R. 41.  Her pregnancy was strenuous at times, but "fortunately for me it didn't break out in handcuffs or have any — to ward against erupt in that period of time."  R. 41.  Since the birth of her new baby, she had been having difficulties sleeping and had gone long periods without remembering to eat.  R. 63.  She had not yet started taking medications since giving birth.   She testified that she had been sober for almost two years; this had a positive effect on her anger management. R. 43, 48.  She stated:

> fortunately for me I have an understanding and loving family. And I have a real
>
> driving desire to maintain my sobriety . . . I go to any lengths to make it to a

8

meeting four or five nights a week. . . if I need to be inappropriate I take it out in a

meeting . . . I freak out on the person that I'm pissed off at, at the time that I'm

being mad, but, you know, most of the time I take it up with my sponsor or my

counselor. . . .

R. 52.  On examination by her attorney, she specified she could "be an evil bitch" even without

drinking.  R. 56.

As for her activities of daily living, she reported doing as little as possible.  R. 54.  She

testified that she did not feel motivated most of the time; she might wash some baby bottles

ahead of time, but she only did laundry when she ran out of clothing to wear.  *Id.*  She would stay

in her pajamas two or three days a week.  R. 54-55.  She used to like to crochet and do crossword

puzzles, but she stated that she had not been able to focus enough lately to do them.  R. 55.

When asked about her job skills, Sandone remarked that her training as a medical

assistant and a certified nurse's aide did not serve her very well because she had lost every job

she had as a result of her behavior.  R. 43.   She testified that she had no income and was

awaiting welfare benefits.  *Id.*   Her last full-time position was with Wal-Mart where she

unloaded trucks, stocked shelves, and stocked bins from June 28, 2001 to December 23, 2001.

R. 43-44.   Sandone testified that she was fired from her job at Wal-Mart after "a falling out with

one of the assistant managers" as a result of a "personality conflict."  R. 44.  She had entered the

pharmacy, which was a restricted area, on two occasions looking for Tylenol for her headache,

R. 45-46, and was sent home for a day; the "so-called legitimate" reason for her termination was

"cussing and stomping and snorting" as she left the building.  R. 44-45.  Sandone testified that

she did not have any attendance or punctuality problems at Wal-Mart.  R. 66.  She remarked that

she made a concerted effort on the job because she was sober and wanted to succeed at something.  R. 66.  Her prior work history included a short time at Hollywood Video in 1999 as a stock person and at Staples.  She had been fired from Hollywood Video because she was in a rehabilitation program for substance abuse and missed work without notifying the store and from Staples because she had been arrested for theft outside the workplace.  R. 46, 47.  (In the past, Sandone had been arrested not only for theft, but for purse snatching and assault and battery; however, her last arrest had occurred three years prior to the hearing and there had been no arrests since she had abstained from alcohol and illegal drugs.   R. 48.)

When asked why she couldn't work, Sandone stated that she had problems with tardiness, scheduling, and impulse control; she could not take orders even from her own mother.  R. 49. She explained, "[s]ometimes things jump off my lips before I even know my mouth is moving." *Id.*   Later, under examination by her attorney, she added that she had trouble controlling her hands in the same way, but she had not been in a fist fight in two and one half years.  R. 60, 62. With respect specifically to the episode that led to her termination from Wal-Mart, she stated she "kept [her] hands to [her]self and left."  R. 61.  She denied being "loud or . . . obnoxious" on that occasion; she testified she  "mumbled a few things under [her] breath on the way out the door, but it wasn't anything loud or aggressive, at least not in [her] opinion"; she obtained unemployment benefits because the firing had not been justified.  R. 43-44.

During the examination, the ALJ remarked on Sandone's good memory for dates; Sandone responded she remembered them "only because they made [her] really angry."  R. 44. She also explained she had been angry ever since her baby was born because of a custody battle with the baby's father; she remarked that when she is angry, she is able to concentrate, and that

10

was why she was able to focus on the day of the hearing.  R. 64.

Hillel Raclaw, M.D.,[3] a certified psychologist, testified that Sandone's medically determinable impairments were bipolar disorder, polysubstance abuse and a "rule out diagnosis" of post traumatic stress disorder, but these impairments did not meet or equal any listing.  R. 68. Dr. Raclaw commented that Sandone had not been taking medication while pregnant, but had remained stable.  R. 69.  He noted that Sandone had fair social skills, was bright and articulate, and had friends.  Dr. Raclaw's opinion was that Sandone's mental impairments were not severe. *Id.*  She was coherent, logical, had an  excellent vocabulary and intact memory, was capable of good humor and "quite polite"; she took care of herself and her baby and was able to maintain sobriety.  R. 69.  Her concentration and memory were excellent; she used "charming phrases" and had effective communication.  *Id.*  Only her "penchant for focusing on the misdeeds of others" made him think her concentration might be moderately limited.  *Id.*  Sandone's activities of daily living and social functioning were only mildly compromised.  R. 69.  Dr. Raclaw found that in the past year there were no periods of decompensation in a work-like setting.  R. 70.  With respect to Plaintiff's impulse control and verbal outbursts, Dr. Raclaw felt that she was able to control her impulsive behavior, based on her abstinence from drugs, her behavior during the hearing, and her care of her child.  *Id.*

Dr. Raclaw testified that the evidence for the personality disorder diagnosis was contained in only one document, so it was not a well-developed diagnosis; it was also not the focus of treatment.  R. 73.  Dr. Raclaw admitted that personality disorders are not really

---

[3] The ME's name is spelled "Raclau" in the hearing transcript and "Raclaw" in the ALJ's decision.  The court will follow the ALJ's spelling.

responsive to treatment.  R. 73.  Dr. Raclaw explained he had a contract with the Disability

Quality Branch ("DQBS") and reviewed randomly selected Social Security Administration cases

where mental health issues were the basis for the application for benefits.  R. 74.  He testified

that he may have reviewed this case if it were selected randomly, but if he or someone else had

reviewed the medical evidence, there would be information or a form in the file, and there was

none.  R. 74-75.  He testified he had seen Sandone's file for the first time only recently.  R. 75.

At the hearing, vocational expert Patricia Scutt ("VE") testified that Plaintiff's past

employment as an inventory clerk at Wal-Mart was unskilled work performed at the medium

exertional level.  R. 76.  Two of the other positions Sandone had held, as a clerk/cashier at

Hollywood Video and as a cashier at Wal-Mart, were lower level semi-skilled positions at the

light exertional level.  R. 76.  Her work as a cashier at Popeye's was classified by the VE as light

unskilled work. R. 76.  The VE also considered Sandone's prior work as a nurse's aide, medical

assistant and phlebotomist.  R. 76.  A position as a phlebotomist is categorized as light semi-

skilled; the VE testified that Sandone worked enough as a phlebotomist to show that she had

acquired some of those skills. R. 76-77.

The ALJ asked the VE whether a younger individual (34-36 years of age), with a limited

education and Sandone's past work experience, without any exertional limitations and with the

ability to understand, remember and follow only simple instructions, could perform any of

Sandone's past work.  R. 76-77.  The VE testified that this hypothetical individual would be able

to return to the fast food and video cashier jobs as well as the inventory stock clerk position..  R.

77-78.

Additionally, the VE testified that Sandone could perform at least three other jobs

available in the national economy: a hand-packer, a medium unskilled job with 107,000 positions nationally and 1500 in the Philadelphia area, R. 78;  a microfiche/microfilm or document preparation person, with a sit/stand option, which is either light or sedentary unskilled work with 174,500 jobs  nationally and 1576 in Philadelphia, *id.*; or a circuit board layout taper, a sedentary unskilled job with 197,421 jobs nationally and 1400 in Philadelphia.  R. 79.  The ALJ then added a restriction that the jobs would not require close constant supervision, that is, "giving constant orders throughout the day to do specific things as opposed to a job where it might be the same thing over and over again."  R. 79.  The VE testified that none of the jobs cited required close supervision. R. 79.

Based on her observations at the hearing, the VE testified that Sandone was very compliant until she heard testimony with which she did not agree.  R. 80.  Sandone retorted that the VE wanted her to work at Taco Bell where she would not be able to support her family and would have to live at home with her mother, or marry a man with a bad attitude who would drink and beat her up every weekend.  R. 80.  The VE was then asked by Sandone's counsel whether an individual who took issue with every directive given to her would be able to maintain employment and work at the jobs listed previously.  R. 81.  The VE testified that such an individual would be precluded from working full-time.  R. 81.  She was then asked whether an individual who would take issue with a third of the directives received during the day could work.  R. 81.  The VE responded that it would depend on the employer, but it was unlikely that an employer would keep an employee who disagreed with supervisors a third of the day.  R. 81.  The VE did point out, however, that Sandone was able to keep a job for six months at one point. R. 81.

## II. STANDARD OF REVIEW

A court reviewing a decision by the Commissioner of Social Security to deny a claimant's application for disability benefits must sustain the decision if it is supported by substantial evidence in the record.  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  More than a scintilla and less than a preponderance, substantial evidence is what a reasonable mind might accept as adequate to support a conclusion. *Id.*   The court will review *de novo* those portions of the Magistrate Judge's R & R to which plaintiff has filed objections. *See* 28 U.S.C. § 636(b)(1).

## III. DISCUSSION

Under the Social Security Act (the "Act"), a person is "disabled" for the purpose of SSI eligibility if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a). The applicant carries the initial burden of proving disability. 42 U.S.C. 423(d)(5). When she establishes an inability to perform prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work existing in the national economy. *See Plummer,* 186 F.3d at 428.

The regulations under the Act establish a five-step sequential evaluation process that the Commissioner, through the ALJ, must employ when reviewing an application for disability benefits. *See* 20 C.F.R. § 416.920. The ALJ must consider, in sequence, whether a claimant: (1) is working and the work is considered substantial gainful activity within the meaning of the Act;

(2) has a severe impairment or combination of impairments which significantly limits the ability (physical or mental) to do basic work activities; (3) has one or more impairments that meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is prevented by the impairment(s) from doing past relevant work; and (5) is prevented by the impairment(s) from doing any other work that exists in the national economy.  20 C.F.R. § 416.920; *see also Olsen v. Schweiker,* 703 F.2d 751, 753 (3d Cir.1983).  If a definitive disability determination can be reached at any stage of the evaluation, further inquiry is unnecessary.  20 C.F.R. § 416.920(a).

The claimant's initial burden is to demonstrate a medically determinable disability, expected to last more than twelve months, that precludes resumption of previous employment. 20 C.F.R. §§ 404.1505, 416.905. *See Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1985). Next, the burden shifts to the SSC to show the claimant, considering age, education, and work experience, has the capacity to perform jobs that exist in the national economy.  20 C.F.R. §§ 404.1520, 416.920. *See Doak,* 790 F.2d at 28. Once the SSC meets this burden, the claimant may rebut it with evidence she cannot perform such work.

After reviewing the medical record and considering Sandone' age, education, and past employment, the ALJ found that Sandone was not eligible for SSI.  Applying the five-step sequential evaluation process established by the Social Security Administration, the ALJ: (1) deferred a determination on whether Sandone's work at Wal-Mart in 2001 constituted substantial gainful activity or an unsuccessful work attempt; and found: (2) Sandone's bipolar disorder was severe; her polysubstance abuse disorder was in remission; her borderline personality disorder was not severe; and Sandone's physical limitations were not severe; (3) the bipolar disorder,

though severe, did not meet or medically equal one of the listed impairments;[4] Sandone retained the residual functional capacity necessary to perform work with no exertional limitations, requiring simple instructions, with one- or two-step demonstrations, and without close supervision; (4) Sandone was able to return to positions she had performed in the past, e.g., inventory clerk and cook-cashier; and (5) Sandone was also able to perform work that existed in the national economy, such as a job as a hand packer, microfiche operator, and circuit board layout/taper.

**Sandone's Objections**

*A. The Magistrate Judge's own recital of the facts shows he erred in finding the denial of*
*benefits was supported by substantial evidence in the record.*

Sandone argues that the medical evidence, as presented in the R&R, "indicates that the ALJ's unfavorable decision was not supported by substantial evidence in the record." She lists facts from the record that might support a finding of disability, such as Sandone's angry outbursts and her various changes of medications.

There is evidence in the record that Sandone's bipolar disorder was a significant

---

[4] In order to meet or equal the listed impairment, a claimant with bipolar disorder must show either: B. two of the following: 1. Marked restrictions of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration; or C. a "chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," plus one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See* 20 C.F.R., pt. 404, subpt. P. app. 1, § 12.04 (Affective Disorders).

impairment during the period under consideration, but there is also evidence that the impairment was not disabling.

Sandone had been stable even though she had to interrupt all psychotropic drugs except low dosages of Paxil (an antidepressant) in May, 2002, when she was pregnant.  The medical examiner, Dr. Raclaw, testified he did not think Sandone's impairments met or equalled any listing.   Sandone did not allege she experienced any episodes of decompensation (Criterion B-4).  With respect to Sandone's ability to perform activities of daily living (Criterion B-1), there is clear evidence in the record, as Sandone confirmed at the hearing, that she was generally able to take care of herself and her children.   Dr. Raclaw found her limitation in this area was mild.  As to social functioning (Criterion B-2), Sandone testified that she made a number of supportive friendships both inside and out of Alcoholics Anonymous; she also testified to a positive relationship with her mother.  Dr. Raclaw found Sandone's impairment mild in this area as well.  The state social security examiner, Dr. Gavazzi, identified mild to moderate–but not marked–problems in this area.  R. 166.  With respect to the central issue identified by Sandone, her inability to control her verbal outburst, Dr. Raclaw testified, "it would be reasonable to conclude that she is able to control her impulsive behavior, as she has done with her drug abuse, and as she'd done here during the interview."  R. 70.  The ALJ wrote Sandone "appeared to be manipulative in the use of her outbursts, and to use them when she thought they would help her case."  R. 18.[5]   Dr. Gavazzi also found Sandone "not wholly credible," because "[a]lthough the

---

[5] Although an ALJ's "credibility judgments . . . alone do not carry the day and overrride the medical opinion of a treating physician that is supported by the record," "an ALJ may consider his own observations of the claimant and [the reviewing court] cannot second-guess the ALJ's credibility judgments."  *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).  In this case, the ALJ's credibility determinations do not contradict a clear record, but are supported by

claimant states that she struggles with her relationships with others and impulse dyscontrol, she

can communicate clearly, relate to familiar others, and respond to direction from others."  R. 166.

Finally, the record contains substantial evidence supporting the ALJ's finding that

Sandone did not have  marked difficulties in maintaining concentration, persistence, or pace.

(Criterion B-3).  Dr. Gavazzi found only mild to moderate problems in this area, and found

Sandone able to "understand and execute simple instructions without special supervision . . . ,

make simple decisions and set simple goals."  R. 165, 167.  Dr. Raclaw found Sandone

"coherent, logical, with excellent vocabulary, capable of good humor"; he observed "her memory

was intact, and she was quite polite."

The vocational expert testified that there were available positions for someone of

Sandone's age and limited education, with no exertional limitations, who required a job with

simple instructions and free of close or constant supervision.  R. 77, 79.  Several of these

positions were classified as requiring only "light" physical exertion; they would be available to

Sandone even if she had some physical limitations.  Although the VE testified under questioning

by Sandone's counsel that a person who disagreed with every directive given to her, or who

disagreed with her employer a third of the day, would have difficulty keeping a job, these

additional conditions are not fairly supported by the medical record; the ALJ's hypothetical was

not erroneous, and she was justified in relying on it.  *See Plummer*, 186 F.3d at 431-32

(upholding ALJ's conclusion where ALJ's hypothetical to the VE was supported by substantial

evidence in the record).

_____

evidence and by the testimony of the medical examiner at the administrative hearing.

The ALJ's finding was supported by substantial evidence in the record; the Magistrate

Judge did not err in upholding it.


*B. The Medical Examiner who testified at Sandone's administrative hearing was employed by the*

*Social Security Administration and was therefore not impartial.*

Sandone contends that because Doctor Raclaw, the Medical Examiner who testified at her

administrative law hearing, was employed by the Disability Quality Branch of the Social Security

Administration, he was not impartial.  Sandone relies on 20 C.F.R. § 416.919q.  That section

addresses conflicts of interest; it does not find a conflict between doing random quality assurance

review on some cases for the Disability Quality Branch and testifying as a Medical Examiner at

administrative law hearings on other claims.  The provision generally counsels against a

physician's working simultaneously for the Social Security Administration and a State agency or

doing review work for the Social Security Administration while having prior knowledge of a

case, "for example, when the claimant was a patient."  Sandone does not allege that Dr. Raclaw

had previously reviewed her claim.  Dr. Raclaw testified that he had no recollection of seeing her

claim until shortly before the hearing and also that, if Sandone's claim had been selected for Dr.

Raclaw's prior review,  her file would have contained a certain form, which it did not contain.

There is no evidence that Dr. Raclaw was not impartial; the mere fact of his concurrent work for

another branch of the Social Security Administration does not require a finding of conflict of

interest.


*C. The Magistrate Judge erred in upholding the ALJ's finding because Sandone's other*

19

*impairments are severe.*

A severe impairment is one that "significantly limit[s the] physical or mental ability to do to do basic work activities." 20 C.F.R. §416.921. Sandone argues her personality disorder, substance abuse, and physical impairments are severe and combined with her bipolar disorder made her disabled.

There is very little in the record about Sandone's personality disorder. This in itself may not be an obstacle to finding the impairment severe, but there must be evidence that it limits her capacity to perform basic work skills. There is no clear evidence of how a personality disorder specifically affects her functioning. The record contains numerous psychological profiles and functional assessments that presumably also record the effects, if any, of Sandone's personality disorder. Its effects were considered by the ALJ as part of his evaluation of the collective effects of Sandone's psychological impairments.

By her own statement, Sandone stopped using drugs or alcohol by April, 2001. There is nothing suggesting that her substance abuse significantly impaired her ability to do basic work activities during the period under consideration. The regulations require the fact-finder to decide whether the claimant would be disabled independently of the effects of alcohol or drug abuse; if the substance abuse is "material" to a finding of disability (i.e., if claimant can be found disabled only by adding the effects of her substance abuse to her other impairments), she may not be found disabled. *See* 42 U.S.C. §423(d)(2)(C). Sandone could only be found disabled if her remaining conditions, "net" of her substance abuse issues, rendered her so; the ALJ did not err in refusing to consider Sandone's substance abuse as a relevant condition.

Finally, although the record contains several references to physical problems, particularly

in connection with incomplete healing from ankle surgery in 1997, Sandone was able to do physical work during the period under consideration.  She worked at Wal-Mart for about 5 months in 2001 unloading trucks among other things; she never alleged that physical impairments interfered with her ability to do that work.

The Magistrate Judge did not err in upholding the ALJ's finding that these alleged impairments did not make Sandone disabled in conjunction with her bipolar disorder.

*D. The Magistrate Judge erred in stating that Sandone's bipolar disorder did not cause more than a minimal limitation of her ability to do basic work activities.*

Sandone argues the Magistrate Judge erred in concluding that Sandone did not did not demonstrate a disorder that caused more than a minimal limitation of ability to do basic work activities and did not meet meet the "C" criteria of Listing 12.04 (the listing for "Affective Disorders").[6]  She argues the ALJ found her bipolar disorder was severe and, by definition, caused more than a minimal limitation of her ability to do basic work activities.  *See* 20 C.F.R. §416.921.  Sandone is correct that the Magistrate Judge  mischaracterized of the ALJ's finding, but this error is immaterial.  The ALJ found that Sandone's bipolar disorder was severe (and caused more than a minimal limitation of her ability to do basic work activities), but she failed to meet the requirements of the relevant listing.  Both the ALJ and the Magistrate Judge correctly listed the § 12.04(C) criteria; Sandone has not shown that she meets them.[7]

---

[6] See *supra* note 4.

[7] In order to meet the criteria, a claimant must show, <u>in addition to</u> a disorder that has caused more than a minimal limitation in basic work activities:
  1. Repeated episodes of decompensation, each of extended duration; or

**IV. CONCLUSION**

Sandone's objections are without merit. The defendant's motion for summary judgment

will be granted, Sandone's motion will be denied, and the decision of the SSC will be affirmed.

---

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04(C).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORETTA SANDONE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JO ANNE B. BARNHART,** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY** | : | **NO. 04-5760** |

**ORDER**

AND NOW, this 20th day of April, 2006, upon consideration of Plaintiff's Motion for

Summary Judgment and Defendants's Motion for Summary Judgment , United States Magistrate

Judge Arnold C. Rapoport's Report and Recommendation, and Plaintiff's Objections to the

Report and Recommendation, for the reasons stated in the foregoing Memorandum, it is hereby

**ORDERED** that:

1. The Report and Recommendation (Paper No.12) is **APPROVED AND ADOPTED**;

2. Plaintiff's Objections to the Report and Recommendation  (Paper No. 13) are

**OVERRULED**;

3. Defendant's Motion for Summary Judgment (Paper Number 10) is **GRANTED**;

4. Plaintiff's Motion for Summary Judgment (Paper No. 9) is **DENIED**;

5. The Clerk of the Court shall mark this case **CLOSED**.

_/s/ Norma L. Shapiro_
S.J.